**WO**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission, | Case No. CV 11-0662-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Evergreen Alliance Golf Limited, LP, a Delaware Corporation, | |
| Defendant. | |

Pending before the Court is Defendant's Motion for Summary Judgment (the "Motion"). (Doc. 57). Defendant has also filed a statement of facts in support of the Motion. (Doc. 58). Plaintiff has filed a Response to the Motion (Doc. 59), a Controverting Statement of Facts in Support of Opposition to the Motion (Doc. 60), and a Separate Statement of Facts (Doc. 61). Further, Plaintiff has filed a Notice of Errata regarding a correction to the Controverting Statement of Facts. (Doc. 63). Finally, Defendant has filed a Reply. (Doc. 64).

## I.     BACKGROUND

In 2005, Kevin Rasnake ("Rasnake") began working as the Membership Sales Director at Arrowhead Country Club ("Arrowhead") in Glendale, Arizona.   As the Membership Director, Rasnake was in charge of bringing new members to the club and selling memberships to Arrowhead.   Rasnake was the only Membership Director at Arrowhead.   As the Membership Director, Rasnake had monthly and yearly sales goals, he

was responsible for retaining members, and he was responsible for developing and implementing marketing strategies and business plans for promoting club sales.  In 2007, the previous owner and manager of Arrowhead, American Golf, added tournament sales to Rasnake's duties.  In November 2007, Defendant Evergreen acquired management rights over Arrowhead and hired Rasnake in the same position with the same duties.  As the Membership Director, Rasnake earned a base salary and received commissions for initiation fees and new dues added when new members joined Arrowhead.  For being in charge of tournament sales, Rasnake earned commissions on sales that brought tournaments to Arrowhead.

Rasnake had one subordinate, Barbara Gonzales ("Gonzales").  Together, Rasnake and Gonzales constituted Arrowhead's Membership Department.  Rasnake and Gonzales worked as a sales team, in that Gonzales's sales numbers also counted toward Rasnake's membership sales goals.  Gonzales' specific focus was on memberships to the fitness center. This sales team relationship was unique at Defendant's company, as Rasnake and Gonzales were the only membership sales team at any of the clubs Defendant operated.  Normally, Membership Directors were responsible for their own sales numbers and the sales of subordinates were not counted toward a Membership Director's sales goals.

Rasnake has cerebral palsy.  His right hand and leg are visibly impaired.  Prior to December 2008, Evergreen staff members were aware of Rasnake's condition.  These staff members included the Arrowhead general manager Chase Swanson ("Swanson"), regional vice president Dale Folmar ("Folmar"), senior vice president of club operations Richard Ellis ("Ellis"), and vice president of sales Belinda Short ("Short").

In December 2008, Defendant offered Swanson the general manager position at Arrowhead to begin in January 2009 and Swanson accepted.  On December 18, 2008, in an initial meeting with twelve members of Arrowhead's staff, including Rasnake, Swanson was asked if he had any children, Swanson answered that he had a large dog that was like raising a "retarded kid."  Rasnake was offended by Swanson's use of the word "retarded."  Rasnake did not believe that Swanson was referring to him personally.  Rasnake believed Swanson

was talking generally about people with disabilities.  At some point following the meeting, Rasnake called Charla Reeves ("Reeves"), Defendant's Human Resources ("HR") director and complained about Swanson's use of the word "retarded."

Reeves, Folmar, and Ellis contacted Swanson about Rasnake's complaint.  In January 2009, Swanson returned to Arrowhead to take over the general manager position.  After starting this position, Swanson allegedly told Ryan Davis ("Davis"), Arrowhead's food and beverage director, that he knew Rasnake had complained about Swanson to HR and that Swanson would be "getting rid of [Rasnake]."  Upon assuming the role of general manager, Swanson was tasked with analyzing individual and department productivity and performance issues.  This specifically included the performance and productivity of the Membership Department.

Rasnake's membership sales numbers were calculated in two different ways.  His membership sales were tracked as a team and combined with Gonzales's sales, and Rasnake's membership sales were also tracked individually for him.  By November 2008, according to the November monthly sales report, Rasnake and Gonzales' had combined to meet 69.94% of Arrowhead's year to date membership sales goal.  By December 2008, according to the annual membership sales report, Rasnake ended the year by individually meeting only 30.14% of his membership sales goal.  This sales percentage was the second worst percentage in the company among Membership Directors at any of Evergreen's clubs in 2008.

By the end of January 2009, Rasnake had sold $366 in memberships against his year to date goal of $20,472—1.79% of his goal.  Through February 2009, Rasnake had sold a total of $8,979 against his year to date membership goal of $36,602—24.53% of his goal.  In 2008 and in January and February 2009, Gonzales sold more than her supervisor, Rasnake.

Beginning in January 2009, Short and Ellis began a review of membership sales at all of Defendant's private clubs and decided to take specific action to address clubs with declining sales.  Short and Ellis wanted to focus Membership Directors on growing membership by bringing in new members to the clubs.  They did this by implementing new

compensation measures across the company and by adjusting commission percentages to focus on new monthly dues rather than on initiation fees.  Short and Ellis also decided to issue Performance Improvement Plans ("PIPs") to poor performing Membership Directors.  These plans had specific, objective, and clearly defined performance expectations that Membership Directors were required to meet over a sixty day period after being issued the PIP.  Short and Ellis were involved in developing, reviewing, and discussing the PIPs before they were issued to Membership Directors.  In January 2009, a Membership Director in Ohio was placed on a PIP.  In February 2009, another Membership Director at a different club in Arizona, Lisa Hungate ("Hungate"), was placed on a PIP.

In March 2009, Rasnake was placed on a PIP.  The performance expectations of Rasnake's PIP were identical to the expectations in Hungate's PIP.  Under Rasnake's PIP, he was expected to make $35,634 in membership sales for March and April 2009, Rasnake was expected to make at least fifty outbound sales calls per week, and Rasnake was expected to form a Membership Committee of eight to ten members at Arrowhead by April 15, 2009.

In April 2009, in order to make compensation consistent across the company, Rasnake was no longer given credit or commissions for sales made by Gonzales at Arrowhead.  Further, in order to focus Rasnake's effort on membership sales, the responsibility for tournament sales was taken way from Rasnake's duties.  Finally, consistent with changes made across the company, Rasnake's commission percentage on new dues added was increased from 40% to 85%, while his commission on initiation fees was lowered from 40% to 5%.  While responsibility for tournament sales was taken away from Rasnake at Arrowhead, another Membership Director in Arizona, Ellen Haboush at the Tatum Ranch club, was given tournament sales responsibilities at her club.

By the end of April 2009, at the conclusion of his PIP, Rasnake had failed to meet any of the performance expectations stipulated by the PIP.  Rasnake missed his sales goal by $14,700—a sales percentage of 58.74%.  Rasnake did not make fifty outbound sales calls in any week while on his PIP.  While the PIP explicitly says that Rasnake had to make fifty outbound sales *calls* each week, Rasnake explained that it was not clear to him if a letter or

other correspondence counted as a sales call under his PIP.  However, even accounting for letters or other correspondence that Rasnake sent, he still did not meet the requisite fifty outbound sales calls per week in any week while on his PIP.  Finally, Rasnake scheduled a Membership Committee meeting for April 22, 2009, but failed to inform attendees that the meeting had been cancelled or rescheduled.  Accordingly, a Membership Committee never met at any time during Rasnake's PIP or during his employment with Defendant.

In early May 2009, following Rasnake's performance while on his PIP, Swanson met with Rasnake and informed him that Defendant was terminating Rasnake's employment because he had failed to meet the expectations of his PIP.  The other two Membership Directors that were placed on PIPs were also terminated following their PIPs for failing to meet their performance expectations as well.

Following Rasnake's termination, Davis alleges that Swanson was discussing with another coworker the need to hire someone to wash dishes at Arrowhead.  Upon hearing that Rasnake was still unemployed, Swanson said, "Never mind.  That probably wouldn't be very effective" and imitated the impairment in Rasnake's right hand, implying Rasnake was physically incapable of being a dishwasher.  Davis also alleges that Swanson made other jokes about Rasnake's disability.  Davis, however, is unable to articulate or explain what those jokes were or when those jokes were made.

On April 5, 2011, Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a complaint against Defendant seeking relief for Rasnake.  (Doc. 1 at 1).  On September 13, 2011, Plaintiff filed an Amended Complaint against Defendant alleging two claims under the Americans with Disabilities Act of 1990 ("ADA").  (Doc. 23 at 4-5 ¶¶ 11-12).  In the Amended Complaint, Plaintiff alleges Defendant unlawfully discriminated against Rasnake in violation of § 102 of Title I of the ADA, 42 U.S.C. § 12112.  (*Id*. at 4 ¶ 11).  Further, Plaintiff alleges Defendant unlawfully retaliated against Rasnake in violation of § 503(a) of Title V of the ADA, 42 U.S.C. § 12203(a).  (*Id*. at 5 ¶ 12).  Following discovery, on July 27, 2012, Defendant filed the pending Motion for Summary Judgment.  (Doc. 57).

## II.    ANALYSIS

1    In the Motion, Defendant contends that it is entitled to summary judgment on
2  Plaintiff's discrimination and retaliation claims and asks this Court to dismiss Plaintiff's
3  Amended Complaint.  (Doc. 57 at 17).  Summary judgment is only appropriate when "the
4  movant shows that there is no genuine dispute as to any material fact and the movant is
5  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact
6  cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts
7  of materials in the record," or by "showing that materials cited do not establish the absence
8  or presence of a genuine dispute, or that an adverse party cannot produce admissible
9  evidence to support the fact."  *Id*. 56(c)(1)(A)&(B).  Thus, summary judgment is mandated
10  "against a party who fails to make a showing sufficient to establish the existence of an
11  element essential to that party's case, and on which that party will bear the burden of proof at
12  trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

13    Initially, the movant bears the burden of pointing out to the Court the basis for the
14  motion and the elements of the causes of action upon which the non-movant will be unable to
15  establish a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the non-
16  movant to establish the existence of material fact.  *Id*.  The non-movant "must do more than
17  simply show that there is some metaphysical doubt as to the material facts" by "com[ing]
18  forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*
19  *Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P.
20  56(e) (1963) (amended 2010)).  In the summary judgment context, the Court construes all
21  disputed facts in the light most favorable to the non-moving party.  *Ellison v. Robertson*, 357
22  F.3d 1072, 1075 (9th Cir. 2004).

23    The mere existence of some alleged factual dispute between the parties will not
24  defeat an otherwise properly supported motion for summary judgment; the requirement is
25  that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc*., 477 U.S.
26  242, 247-248 (1986).  A material fact is any factual issue that might affect the outcome of the
27  case under the governing substantive law.  *Id*. at 248.  A material fact is "genuine" if the
28  evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id*.

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  *Id*. at 249-250.  If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment.  *Id*.

### A.   Plaintiff's ADA Claim for Discrimination under 42 U.S.C. § 12112

Plaintiff claims Defendant discriminated against Rasnake on the basis of Rasnake's disability by placing Rasnake on a PIP when other non-disabled sales directors with similar performance metrics were not disciplined, by setting unattainable sales goals for Rasnake, by changing the types of sales that would be attributed to Rasnake, by removing a significant portion of Rasnake's sales responsibilities, resulting in a reduction of his commission earnings potential, and by terminating Rasnake's employment.  (Doc. 23 at 4 ¶ 11).

Courts have consistently utilized the burden-shifting approach established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973), when reviewing motions for summary judgment in claims for disparate-treatment under the ADA.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n. 3 (2003).  Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a prima facie case of discrimination, a plaintiff must show that he or she: (1) is a disabled person within the meaning of the ADA, (2) is qualified with or without a reasonable accommodation to perform the essential functions of the job, and (3) suffered an adverse employment action because of the disability.  *Kennedy v. Applause, Inc*., 90 F.3d 1477, 1481 (9th Cir. 1996).  Once a plaintiff has established a prima facie case, the burden (of production) then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 802.  Finally, a burden of persuasion reverts to the plaintiff to provide evidence that the reasons put forth by the defendant constitute mere pretext.  *Burdine*, 450 U.S. at 256.  In the context of a motion for summary judgment, the plaintiff

must raise a genuine issue of material fact that the defendant's legitimate, non-discriminatory reason for an adverse employment action was pretextual. *Snead v. Metro. Prop. & Cas. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001).

### 1. Plaintiff's Prima Facie Case

The Court assumes, *arguendo*, that Plaintiff could establish a prima facie case of discrimination because, as discussed below, *see supra* Section II.A.3, the Court finds Plaintiff has not shown that Defendant's legitimate non-discriminatory reasons are pretext.

### 2. Defendant's Legitimate Non-Discriminatory Reasons

Defendant must "articulate some legitimate nondiscriminatory reason" for putting Rasnake on a PIP, for changing Rasnake's job description and compensation, and for eventually terminating Rasnake. *McDonnell Douglas*, 411 U.S. at 802.

In March 2009, Rasnake was placed on a PIP. Defendant explains that Rasnake was put on the PIP, along with two other Membership Directors, because he was one of the worst performing Membership Directors in the company in 2008 and early 2009. (Doc. 57 at 14). Part of Defendant's efforts to improve membership sales across the nation included issuing PIPs to poor performing Membership Directors. (Doc. 58 at 9 ¶ 65). In 2008, Rasnake's membership sales goal, set by his previous employer, American Golf, was $236,400. (Doc. 57 at 3). However, Rasnake admitted in his deposition that he had only $71,245 in membership sales that were attributed to him in 2008, which was only 30.14% of his annual goal. (Doc. 58-1 at 15). Rasnake's membership sales performance in 2008 was the second worst performance of any Membership Director on the annual 2008 membership sales report. (Doc. 60 at 7-8 ¶ 32). Leading up to putting Rasnake on a PIP, in January 2009, Rasnake sold $366 in memberships against his goal of $20,472 for that month. (Doc. 57 at 4). Through February 2009, Rasnake had sold a total of $8,979 against his membership goal of $36,602, which was only 24.53% of his goal for the first two months of 2009. (*Id*.). In 2008 and by the first two months of 2009, Gonzales, Rasnake's subordinate, had outsold her supervisor. (*Id*.).

In January 2009, Defendant placed a Membership Director in Ohio on a PIP. (Doc.

58 at 10 ¶ 66).  In February 2009, Defendant placed another Membership Director in Arizona on a PIP.  (*Id.* at ¶ 68).  Following Rasnake's sales performance in 2008 and January and February 2009, Swanson placed Rasnake on a PIP in March 2009.  (*Id.* at 10 ¶ 71).  Rasnake's PIP was discussed by Short, Ellis, Swanson, and Reeves prior to Rasnake being placed on it.  (*Id.* at 11 ¶ 72).  Rasnake's PIP had the same performance expectations as the PIP issued to the other Membership Director in Arizona.  (*Id.* at 11 ¶ 73).

In April 2009, Rasnake's job description and compensation were changed.  Defendant contends that the changes were entirely legitimate.  Rasnake was the only Membership Director in the company who received commissions for another person's sales.  Accordingly, Defendant eliminated that portion of Rasnake's compensation to make payment structures consistent for Membership Directors across the company. (Doc. 57 at 14).   Defendant changed Rasnake's job description by removing Rasnake's tournament sales responsibilities and commissions in order to focus all of Rasnake's efforts on membership sales.  (*Id.*).  Finally, Defendant reduced all Membership Director's, including Rasnake's, initiation fee commission and increased their dues added commission, in order to focus their efforts on increasing monthly dues rather than initiation fees.  (*Id.* at 5).  Defendant explains that Swanson had nothing to do with these changes in Rasnake's compensation structure.  (*Id.* at 14).   The changes to Rasnake's compensation resulted from the company's efforts to equalize pay structures across the country and focus the efforts of all of its Membership Directors on growing the membership by concentrating on monthly dues.  (*Id.* at 13).

Finally, Defendant contends that Rasnake was terminated in May 2009 because he failed to meet the expectations of his PIP.  (*Id.* at 6).  First, Rasnake failed to meet his membership sales goals for March and April 2009.  (*Id.* at 5).  Rasnake's goal was $35,634 for those months and he missed this goal by $14,700.  (*Id.* at 5-6).  Second, Rasnake failed to make the requisite fifty outbound sales calls per week pursuant to his PIP.  (*Id.* at 6).  While the PIP explicitly says that Rasnake had to make fifty outbound sales *calls* each week, Rasnake explained that it was not clear to him if a letter or other correspondence counted as a sales call under his PIP.  (*Id.*).   However, even accounting for letters or other

correspondence that Rasnake sent, he still did not meet the requisite fifty outbound sales calls per week in any week while on his PIP.  (*Id.*).  Third, Rasnake failed to form a Membership Committee by April 15, 2009 pursuant to his PIP.  (*Id.*).  Rasnake scheduled a Membership Committee meeting for April 22, 2009, but failed to inform attendees that the meeting had been cancelled or rescheduled.  (*Id.*).  Accordingly, a Membership Committee never met at any time during Rasnake's PIP or during his employment with Defendant.

The Court finds these are legitimate non-discriminatory reasons for Defendant's decision to terminate Rasnake.  Therefore, Defendant has met its burden under *McDonnell Douglas*.  The burden now shifts back to the Plaintiff.

### 3.   Plaintiff's Burden to Show Pretext

"[Plaintiff] now must have the opportunity to demonstrate that the proffered reason[s] w[ere] not the true reason[s] for the employment decision.  This burden now merges with the ultimate burden of persuading the court that [Rasnake] has been the victim of intentional discrimination.  [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–805).

Plaintiff argues that "[t]here is direct evidence that Swanson engineered Rasnake's termination because of his complaint and his disability."  (Doc. 59 at 12).  Direct evidence "is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."  *Coghlan v. American Seafood Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation and quotation marks omitted); *Tempesta v. Motorola, Inc.*, 92 F. Supp. 2d 973, 980 (D. Ariz. 1999) ("comments only constitute direct evidence if, assuming their truth, they would "prove[ ] the fact of [discriminatory animus] without inference or presumption.") (quoting *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1220 (9th Cir. 1998)).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Id*.  Circumstantial evidence, on the other hand, "requires an additional inferential step to demonstrate discrimination."  *Id*.  "Because direct evidence is so

-10-

probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact." *Id*. (citation omitted).  When a plaintiff relies on circumstantial evidence, however, "that evidence must be specific and substantial to defeat the employer's motion for summary judgment."  *Id*. (citation and quotation marks omitted).  Contrary to Plaintiff's claim that direct evidence exists, Plaintiff offers only circumstantial evidence that Defendant discriminated against Rasnake.

First, Plaintiff argues that direct evidence of Defendant's discriminatory animus is shown by Swanson allegedly saying he would be "getting rid of [Rasnake]," by Swanson's derogatory remark about his dog being like a "retarded kid," by disability related "jokes" about Rasnake that Swanson allegedly made to Davis, and by Swanson allegedly saying Rasnake would not be an effective dishwasher because of his physical limitations.  (Doc. 59 at 12).  Next Plaintiff argues that Swanson was inextricably linked to the decision making process and that his discriminatory animus shows Defendant's claims justifying its business decisions are merely pretext.  (*Id*. at 12-13).  Further, Plaintiff argues that the fact that Haboush had comparable sales numbers and was not placed on a PIP is evidence of pretext.  (*Id*. at 15).  Finally, Plaintiff argues that Rasnake's sales numbers did not justify Rasnake's termination and being placed on a PIP.  (*Id*. 59 at 14).

### a.   Swanson's Comments

The first comment at issue is when Swanson told Davis that Swanson knew Rasnake was the party that had complained about Swanson to HR and Swanson said he would be "getting rid of him," referring to Rasnake.  This is not evidence of disability discrimination.  As discussed below, this comment is direct evidence of retaliation under the circumstances it was made.  *See infra* Section II.B.3.  This comment had nothing to do with Rasnake's disability.  This comment solely concerned Swanson's reaction to finding out Rasnake complained about him to HR.

The additional comments at issue are Swanson's single use of the word "retarded," the alleged disability related jokes that Swanson made, and Swanson's implication that Rasnake was incapable of being hired as a dishwasher.  Courts in the Ninth Circuit have

found that stray comments not directly tied to an employee's termination are not direct evidence of discrimination. In *Nesbit v. Pepsico*, the Ninth Circuit Court of Appeals explained that a comment by a plaintiff's supervisor that "we don't necessarily like grey hair," that "was uttered in an ambivalent manner and was not tied directly to [plaintiff's] termination. [ ] [Was] at best weak circumstantial evidence of discriminatory animus toward [plaintiff]." 994 F.2d 703, 705 (9th Cir. 1993). Further, the comment "we don't want unpromotable fifty-year olds around" made by the company's Senior Vice President of Personnel was "very general and did not relate in any way, directly or indirectly, to the termination of [plaintiff]." *Id.* The Court of Appeals held that when a comment at issue is not tied directly to the employee's termination it is insufficient to establish discriminatory animus. *Id.*; *see also Nidds v. Schindler Elev. Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (supervisors comment that he intended to get rid of all "old timers" found to be stray remark because it was ambivalent and not tied to the plaintiff's termination); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (decision maker's comment that he chose another employee for promotion because he was "bright, intelligent, knowledgeable young man" insufficient to create triable issue over whether plaintiff was not selected because of his age); *Tempesta*, 92 F. Supp. 2d at 980 (comments that are not tied directly to an employee's termination are stray remarks not direct evidence of discrimination).

Swanson's use of the word "retarded" was not directed at Rasnake, it did not concern Rasnake's actual disability, and it had nothing to do with Rasnake being terminated. Thus, under *Nesbit*, this comment does not constitute direct evidence of discriminatory animus, at best it is circumstantial evidence.

The alleged disability related jokes about Rasnake made by Swanson, of which Davis was unable to remember actual examples or when they were made, and Swanson's implication that Rasnake would be incapable of being a dishwasher, were both stray remarks. This evidence, if believed by a trier of fact, would not prove disability discrimination without inference or presumption. This evidence is not tied to any adverse employment action made by Defendant. Accordingly, it is not direct evidence of discrimination and is also

-12-

1    circumstantial evidence that Swanson held a discriminatory animus.

2                    **b.    Defendant's Business Decisions**

3            In addition to the comments made by Swanson, Plaintiff argues Swanson was

4    inextricably linked to the decision making process and that his discriminatory animus shows

5    Defendant's explanations justifying its business decisions are merely pretext.  (Doc. 59 at

6    12-13).  Plaintiff, however, offers no evidence to support this argument.

7            Defendant removed tournament sales and Gonzales's membership sales from

8    Rasnake's sales numbers and Defendant changed Rasnake's commission structure.  Short

9    and Ellis's decisions regarding Gonzales's membership sales and Rasnake's commissions

10   were changes made equally across the company.  These decisions had nothing to do with

11   Rasnake.  In April 2009, Rasnake was no longer given credit for Gonzales's sales, as he was

12   the only one in the company being given this credit in the first place.  This change was made

13   to make payment structures consistent for Membership Directors across the company.

14   Further, Short and Ellis made the decision to reduce *all* Membership Director's initiation fee

15   commissions and increase their dues added commissions in order to focus all of their efforts

16   on increasing monthly dues rather than initiation fees.  Plaintiff has offered no evidence that

17   these decisions were anything but legitimate business decisions.

18           Tournament sales were removed from Rasnake's responsibilities in order to focus

19   Rasnake solely on membership sales, which was a consistent motive across the company.

20   Membership sales were the largest revenue line in the budget and Short recommended

21   removing tournament sales from Rasnake's responsibilities after talking with Swanson and

22   Ellis because there was a huge shortfall in that area.  The only evidence Plaintiff has

23   proffered to show this was not a legitimate business decision is the fact that another

24   Membership Director at a different club in Arizona, Haboush, was given tournament sales

25   around the same time. (Doc. 59 at 15).

26           The mere fact that Haboush was given tournament sales is not evidence in itself of

27   discrimination.  Rasnake claims Haboush had a lower sales percentage in 2008 than

28   Rasnake, yet she was given tournament sales while they were taken away from Rasnake's

duties.  This simply is not true.  Rasnake met just 30.14% of his individual sales goal in 2008.  (Doc. 58-1 at 69).  Haboush met 47.84% of her individual sales goal in 2008.  (*Id*.). Further, Haboush was not placed on a PIP.  There is no evidence that Defendant's decision to give Haboush tournament sales at her club and take tournament sales from Rasnake at his club while Rasnake was on a PIP was a discriminatory action.   It was merely a business decision that Defendant had the right to make.  Therefore, this action also cannot be taken as circumstantial evidence of discriminatory animus.

### c.       Defendant's Treatment of Another Membership Director

Further, Plaintiff argues that the fact that Haboush had comparable sales numbers and was not placed on a PIP is evidence of pretext.  (Doc. 59 at 15).  Rasnake was the second worst performing Membership Director in the company in 2008 and by the end of January 2009 he had sold only 1.79% of his sales goal.  (Doc. 62-2 at 9, 11).  In January 2009, Haboush met 37.29% of her year to date goal, compared to Rasnake's 1.79%.  (*Id*. at 11). By February 2009, Rasnake had met 24.53% of his year to date goal, while Haboush had attained 22.88% of her year to date goal.  (*Id*. at 12).  At the beginning of March 2009, Rasnake was placed on his PIP.  While Rasnake had performed better in February and had raised his numbers to Haboush's level by then, Haboush far out performed Rasnake in the year prior and in January.  Rasnake had merely equaled Haboush's sales by February.  The Court finds that Haboush's and Rasnake's sales numbers were not comparable and Defendant's reasons for putting Rasnake on a PIP while not putting Haboush on a PIP were entirely legitimate.  Plaintiff has offered no other evidence.  Thus, Plaintiff has not shown that Defendant's decision to put Rasnake on a PIP while not putting Haboush on a PIP indicates discrimination against Rasnake.  Therefore, this action is also not circumstantial evidence of discrimination.

### d.       Rasnake's Sales Numbers

Finally, Plaintiff argues that Rasnake's sales numbers did not justify Rasnake's termination and being placed on a PIP because Swanson admitted the way in which Rasnake's numbers were totaled made it "pretty difficult" to accurately assess Rasnake's

individual sales performance.  (Doc. 59 at 14).  Rasnake was the only Membership Director in the company that was given credit and a commission for his subordinate Gonzales's membership sales.  Rasnake claims he worked as a sales team with Gonzales toward a shared membership sales goal until March 2009.  Plaintiff argues that Gonzales would inaccurately put in Rasnake's sales numbers by logging in as herself and then inputting sales numbers that both Rasnake and Gonzales had achieved together.  Thus, these numbers would be attributed to Gonzales and not be attributed to Rasnake.  As proof of this, Rasnake claims his sales numbers dropped from 69.94% in November 2008 to 30.14% when Gonzales's numbers were calculated separately.  (Doc. 59 at 14).  This statement, however, is misleading.

Rasnake was placed on a PIP and eventually terminated because of his individual performance.  There were two types of sales reports in 2008, the monthly sales reports for November and December 2008 (Doc. 62-5 at 10-14, 15-23) and the 2008 annual membership report (Doc. 62-6 at 1-9).  On the monthly report for November 2008, Rasnake did indeed have a membership sales percentage of 69.94%.  (Doc. 62-5 at 14).  The monthly report for December 2008 is virtually unreadable, but it appears to indicate that Rasnake's membership sales goal dropped to 27.17% in December.  (Doc. 62-5 at 17).  The annual sales report says Rasnake had a year to date membership sales percentage of 30.14% in December 2008.  (Doc. 62-6 at 9).  Regardless of what happened between November and December 2008, Rasnake still only met approximately 30% of his individual membership sales goal in 2008 which Defendant indicated was a priority to the company.  Even if Gonzales inaccurately entered Rasnake's sales as her own in 2008, Rasnake still only sold less than 2% of his goal in January 2009 and approximately 24.53% of his goal in February 2009.  (*Id*. at 11-12).  Plaintiff has offered no evidence that indicates these were not Rasnake's sales percentages in January and February.  These numbers led to Rasnake being put on a PIP in March.  Rasnake's performance on the PIP is what led to his termination and Rasnake admits this performance was not tied to Gonzales' performance.  Further, Defendant had a legitimate right to not allow Rasnake to operate as an exception within the company and allow him to account for and receive commissions on membership sales made by Gonzales.  Accordingly,

1  the Court finds this is not evidence of any discriminatory intent on the part of Defendant.

2  In summary, Plaintiff has proffered no direct evidence of discrimination and only

3  minimal circumstantial evidence that Defendant discriminated against Rasnake.  Specifically,

4  the circumstantial evidence Plaintiff has offered is Swanson's use of the word "retarded," the

5  alleged disability related jokes about Rasnake made by Swanson to Davis, which Davis was

6  unable to remember actual examples of, and Swanson's implication that Rasnake would be

7  incapable of being a dishwasher.  There is no issue for trial unless there is sufficient evidence

8  favoring the non-moving party for a jury to return a verdict for that party.  *Anderson*, 477

9  U.S. at 249-50.   To create an issue for trial with circumstantial evidence alone, "that

10  evidence must be specific and *substantial*."  *Coghlan*, 413 F.3d at 1095 (emphasis added).  If

11  evidence is merely colorable or is not significantly probative, the judge may grant summary

12  judgment.  *Anderson*, 477 U.S. at 249-50.  The Court finds Plaintiff has not met this burden

13  and provided specific and substantial evidence that terminating Rasnake was anything but a

14  legitimate business decision.  Plaintiff has not shown that Defendant's legitimate reasons for

15  terminating Rasnake are pretext and raised a genuine issue of material fact.  Accordingly, the

16  Court grants Defendant's Motion for Summary Judgment on Plaintiff's discrimination claim

17  under 42 U.S.C. § 12112.

18  **B.  Plaintiff's ADA Claim for Retaliation under 42 U.S.C. § 12203(a)**

19  In the second claim, Plaintiff alleges Defendant retaliated against Rasnake for

20  contacting HR about Swanson's comment at the staff meeting in December 2008.  (Doc. 23

21  at 5 ¶ 12).  Under the ADA, "[n]o person shall discriminate against any individual because

22  such individual has opposed any act or practice made unlawful by this chapter or because

23  such individual made a charge, testified, assisted, or participated in any manner in an

24  investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Plaintiff

25  claims Defendant retaliated against Rasnake in violation of § 12203(a) by placing Rasnake

26  on a PIP when other disabled sales directors with similar performance metrics were not

27  disciplined, by setting unattainable sales goals for Rasnake, by changing the types of sales

28  that would be attributed to Rasnake, by removing a significant portion of Rasnake's sales

responsibilities, resulting in a reduction of his commission earnings potential, and by terminating Rasnake's employment.  (Doc. 23 at 5 ¶ 12).

The *McDonnell Douglas* framework and allocation of proof that governs disparate treatment claims also governs retaliation claims.  *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citing *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir. 1986).  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a prima facie case of retaliation, a plaintiff must show: (1) engagement in a protected activity under the ADA, (2) an adverse employment action, and (3) a causal link between the two.  *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003).  If the plaintiff establishes a prima facie case of retaliation, the defendant has the burden of articulating a legitimate, non-retaliatory reason for its action.  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005); *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant has presented a purpose for the action, the plaintiff bears the ultimate burden of providing evidence that the defendant's reason is "merely a pretext for a retaliatory motive."  *Id.*; *McDonnell Douglas*, 411 U.S. at 804.

### 1.    Plaintiff's Prima Facie Case

#### a.    Protected Activity

Plaintiff has the initial burden to show that he engaged in a protected activity to establish a prima facie case of retaliation.  *Brown*, 336 F.3d at 1186-87.  Defendant argues that Plaintiff cannot show that Rasnake engaged in a protected activity because Rasnake could not have had a reasonable belief that an unlawful employment practice occurred when he complained to HR.  (Doc. 57 at 8-9).

It is well established that "[o]pposition to an unlawful employment practice constitutes protected activity."  *Finical v. Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032, 1049 (D. Ariz. 1999) (quoting *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994)); *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) ("pursuing one's rights under the ADA constitutes a protected activity."); *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526

(9th Cir. 1994) (quoting *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir. 1983) ("We have held that when an employee protests the actions of a supervisor such opposition is a 'protected activity.'")).  A plaintiff's opposition, however, must be based on a reasonable belief that the employer committed an unlawful employment practice.  *Moyo*, 40 F.3d at 985.

 "The ADA forbids discrimination in employment on the basis of disability . . . and forbids retaliation against those who oppose acts prohibited by the ADA."  *Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1242 (9th Cir. 2010) (citing 42 U.S.C. §§ 12112(a), 12203).  The same framework applies to an ADA retaliation claim that applies to claims made under Title VII.  *Barnett v. U.S. Airways, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) (en banc) ("[W]e join our sister circuits in adopting the Title VII retaliation framework for ADA retaliation claims."), vacated on other grounds, *U.S. Airways v. Barnett*, 535 U.S. 391 (2002).

 "The reasonableness of [a plaintiff's] belief that an unlawful employment practice occurred must be assessed according to an objective standard-one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims."  *Moyo*, 40 F.3d at 985.  Even if a plaintiff's belief is mistaken, it is reasonable "if premised on a mistake made in good faith.  A good-faith mistake may be one of fact or of law."  *Id.* at 984 (citing *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987) (English-only order not a Title VII violation as a matter of law, but opposition based on a reasonable belief that the order was discriminatory is protected)).  Further, "it has been long established that Title VII, as remedial legislation, is construed broadly.  This directive applies to the reasonableness of a plaintiff's belief that a violation occurred, as well as to other matters."  *Id.* (citation omitted).

 Defendant argues that the Supreme Court's ruling in *Breeden* explicitly precludes Plaintiff from having an objectively reasonable belief that a single isolated comment constitutes a violation of the ADA.  (Doc. 64 at 8).  Defendant's argument appears to be based off of the Supreme Court's statement that "a recurring point in our opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the terms and conditions of employment."  (*Id*. at 5) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2011)).  However, the Court notes that whether a complaint is solely based on a single offhand comment is not a bright line test for reasonableness.  As the Supreme Court also explained in *Breeden*, and as Defendant quoted, the Court must consider all of the circumstances.  (*Id*.) (quoting *Breeden*, 532 U.S. at 270-71) ("Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance.").  Further, Defendant argues that the reasonableness of Plaintiff's belief is not measured against Plaintiff's subjective ignorance of the substantive law, but the reasonableness is measured against the substantive law itself and what actually constitutes unlawful conduct.  (*Id*.) (quoting *Clover v. Total Sys. Servs., Inc*., 176 F.3d 1346, 1351 (11th Cir. 1999)) ("objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.").  As Defendant points out, the Court must consider the substantive law when assessing reasonableness of an employee's belief that an unlawful employment practice occurred because failing to "would eviscerate the objective component of [the] reasonableness inquiry."  (*Id*. at 5-6) (quoting *Harper v. Blockbuster Entm't Corp*., 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998)).

In this case, the Court finds Rasnake had an objectively reasonable belief that Swanson's comment constituted a violation of the ADA.  Swanson made a lone comment at a staff meeting that was offensive and inconsiderate.  Swanson was asked during a December 2008 staff meeting whether he and his wife had any children, Swanson said no, he had a large dog; then Swanson made an analogy attempting to say his dog "wasn't very bright" because raising it was like raising a "retarded kid."  (Doc. 62-3 at 124-125).  The word "retarded" is unquestionably a derogatory term used to describe the mentally disabled, a protected class of people under the ADA.  Swanson's use of the term, even though it was used to describe his dog, still derogatorily portrayed disabled children.  Rasnake is physically

disabled.  (Doc. 60 at 32 ¶ 134).  Swanson was hired as Rasnake's supervisor.  The comment was made at the initial meeting in an informal environment amongst team members. Swanson was aware that Rasnake was disabled prior to the meeting, even though Swanson met Rasnake for the first time at the meeting.  This was indeed a single, offhanded comment, however, Rasnake would be working directly for Swanson.  While Rasnake admits he had never read or researched the ADA in any way before complaining to HR about Swanson (Doc. 60 at 27 ¶ 107), the Court finds it was objectively reasonable under these circumstances for Rasnake to believe, even if his belief was wrong, that under the ADA his supervisor could not derogatorily use the word "retarded" in a professional environment. Accordingly, because Rasnake's belief was reasonable, Plaintiff has established that Rasnake's complaint to HR was a protected activity.

### b.    Adverse Employment Action

For Plaintiff to establish the requisite prima facie case of retaliation, Plaintiff must also show an adverse employment action.  *Brown*, 336 F.3d at 1186-87.  An act is an "adverse employment action" if the act is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party from engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000) (internal citations omitted).

> Our circuit defines that term "broadly," and examples of adverse employment actions could include "transfers of job duties," "transfer to another job [even] of the same pay and status," "changes in work schedules," *Ray*, 217 F.3d at 1240–43 (internal citation omitted), "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion," *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000) (internal citations omitted). Merely "declining to hold a job open" or "badmouthing an employee outside of the job reference context" does not reach that level.  *Id*. at 928–29.

*Brown v. Potter*, 457 F. App'x 668, 672 (9th Cir. 2011).

Under this standard, Plaintiff has shown Rasnake was subjected to an adverse employment action.  In March 2009, Rasnake was put on a PIP.  (Doc. 59 at 5).  In April

2009, Rasnake's duties were changed and part of his compensation was taken away. (*Id*.). In May 2009, Rasnake was terminated. (*Id*.). The Court finds these are enough facts to establish an adverse employment action in this case.

### c.    Causal Link

Finally, to prove a prima facie case of retaliation, Plaintiff must show a causal link between the protected activity and the adverse employment action. *Brown*, 336 F.3d at 1186-87. "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff*, 809 F.2d at 1376 (citing *Miller v. Fairchild Indus., Inc*., 797 F.2d 727, 731-32 (9th Cir. 1986)); *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002) (recognizing that causation may be inferred from timing alone where an adverse employment action follows on the heels of protected activity). In *Yartzoff*, sufficient evidence existed to create the inference of a causal link where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended. 809 F.2d at 1376; *see also Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 919 (9th Cir. 1996) (sufficient evidence to create an inference of causal link where layoff occurred four months after supervisor asked the plaintiff if plaintiff had dropped his discrimination complaint). In contrast, in *Cornwell v. Electra Central Credit Union*, a nine month gap in time between the plaintiff's complaint and his termination was too long to support an inference of a causal link. 439 F.3d 1018, 1035 (9th Cir. 2006); *see also Villiarimo*, 281 F.3d at 1065 ("A nearly 18-month lapse between the protected activity and adverse employment action is simply too long, by itself, to give rise to an inference of causation.").

In this case, Rasnake made the complaint to HR in December 2008. Swanson was aware that Rasnake was the party that complained about the comment because Swanson was told this by Reeves prior to starting in Phoenix. Just over two months after the complaint, at the beginning of March 2009, Rasnake was put on a PIP. Four months after the complaint,

in April 2009, Rasnake's duties and his compensation were changed.  Five months after the complaint, in May, Rasnake was terminated.  The Court finds this circumstantial evidence sufficient to infer a causal link between Rasnake's complaint and Defendant's allegedly retaliatory employment decisions.  Accordingly, Plaintiff has established a prima facie case of retaliation under *McDonnell Douglas* and the burden now shifts to Defendant to proffer a legitimate reason for its employment decisions.

### 2.  Defendant's Legitimate Non-Discriminatory Reasons

Defendant has proffered the same legitimate non-discriminatory reasons for its employment decisions that Defendant used to defend against Plaintiff's discrimination claim as explained above.  *See supra* Section II.A.2.  Accordingly, the burden shifts back to Plaintiff.

### 3.  Plaintiff's Burden to Show Pretext

Plaintiff must produce sufficient evidence supporting its contention that the nondiscriminatory reasons proffered by Defendant are pretexts for retaliation in order for Plaintiff's retaliation claim to survive Defendant's Motion for Summary Judgment.  *See Ray*, 217 F.3d at 1244; *Burdine*, 450 U.S. at 256.  To show pretext for retaliation, Plaintiff can directly persuade the Court that a discriminatory reason more likely motivated Defendant or can indirectly show that the Defendant's proffered explanation is unworthy of belief.  *Stegall v. Citadel Broad. Co*., 350 F.3d 1061, 1066 (9th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256).  If a plaintiff offers direct evidence of retaliatory motive, a triable issue as to the actual motivation of the employer exists even if the evidence is insubstantial.  *Id*. (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  If a plaintiff offers circumstantial evidence, however, the Court requires specific and substantial evidence of pretext to survive summary judgment.  *Id*.

A plaintiff may establish a retaliation claim through a preponderance of the evidence (whether direct or circumstantial) that retaliation played a motivating factor in the termination.  *Id*. at 1068.  In order to rebut the defendant's legitimate non-discriminatory reasons, the plaintiff must produce evidence in addition to the evidence that satisfied

plaintiff's prima facie burden. *Id*. at 1069. But the Court does not ignore the prima facie evidence at the pretext phase. *Id*.

In this case, the Court finds Plaintiff has offered direct evidence of a retaliatory motive. In his deposition, Davis, Arrowhead's food and beverage director, alleged that while speaking with Swanson in January 2009, Swanson told Davis that Swanson knew Rasnake had complained about Swanson's comment to HR, and that Swanson said he would "take care of it" by "getting rid of him," referring to Rasnake. (Doc. 62-3 at 18).

Even if Plaintiff offers insubstantial direct evidence, "a triable issue as to the actual motivation of [Defendant] exists." *Stegall*, 350 F.3d at 1066. The Court finds this is enough direct evidence of retaliation to create a triable issue of material fact and to preclude summary judgment. Therefore, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim under 42 U.S.C. § 12203(a).

## III.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 57) is granted in part and denied in part. Specifically, Defendant's motion for summary judgment on Plaintiff's discrimination claim, under 42 U.S.C. § 12112, is granted and Plaintiff's discrimination claim is summarily dismissed. Defendant's motion for summary judgment on Plaintiff's retaliation claim, under 42 U.S.C. § 12203(a), is denied.

Dated this 26th day of March, 2013.

James A. Teilborg
Senior United States District Judge