**WO**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Equal Employment Opportunity
Commission,

           Plaintiff,

v.

Evergreen Alliance Golf Limited, LP, a
Delaware Corporation,

           Defendant.

Case No. CV 11-0662-PHX-JAT

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

On July 29, 30, and 31, 2013, the Court presided over a bench trial in this matter. In the Final Pretrial Order (Doc. 77), Plaintiff Equal Employment Opportunity Commission (the "EEOC") and Defendant Evergreen Alliance Golf Limited ("Evergreen") set forth approximately ten (10) issues of fact and law to be tried and determined. Generally, the issues can be summarized as follows: (1) whether Kevin Rasnake's ("Rasnake") complaint to human resources ("HR") constituted protected activity; (2) whether Evergreen's decisions to place Rasnake on a Performance Improvement Plan ("PIP"), to no longer pay Rasnake commissions on his subordinate's sales, to remove tournament sales from his compensation structure, to reduce his bonus, to terminate his employment, and to designate Rasnake ineligible for rehire and not to pay him any severance were adverse employment actions; (3) whether Rasnake's complaint to HR was the but-for cause of these decisions by Evergreen; (4) whether Evergreen's decisions constituted retaliation against Rasnake after he complained to HR in violation of Title I and § 503(a) of Title V of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12203(a); and (5) whether Rasnake is entitled to any backpay compensation.  Following the bench trial, the Court hereby finds and concludes as follows:

**I.       FINDINGS OF FACT**

<u>**Introduction**</u>

1.       This action was filed by the EEOC acting on behalf of Rasnake.

2.       Defendant Evergreen is a limited partnership incorporated in Delaware.

<u>**Rasnake's Position as Membership Director**</u>

3.       In July 2005, Rasnake was hired as the Membership Director ("MD") at Arrowhead Country Club ("Arrowhead"), a private country club in Glendale, Arizona.

4.       Prior to working at Arrowhead, Rasnake had no prior experience in the golf industry and no experience selling golf memberships.

5.       As the MD, Rasnake's job description included responsibility for continuous growth of the membership roster including all membership sales, member retention, club tours, and the preparation of all membership sales materials; responsibility for generating sufficient prospect inventory to support the Club's sales plan in accordance with standards—one standard being to make fifty (50) outbound sales phone calls per week; responsibility for the formation and function of a Membership Committee; and other duties as assigned by his supervisor or management.

6.       As the MD, Rasnake was given a sales goal to meet monthly and annually by management that was tracked via a Customer Relations Management system called SAGE.

7.       Arrowhead offered members at its private clubs different categories of memberships. The most expensive membership and the primary membership Rasnake was responsible for selling were golf memberships.  Golf memberships were by far the top revenue producing product that the club sold.  The sale of golf memberships was vital to the financial survival of the club.

8.       Full golf memberships entailed an initiation fee, that in 2008 and 2009 was $4,000, a

monthly fee, and a minimum food and beverage fee that members paid the club.  In addition to golf memberships, the club also sold social ($99 initiation fee and $42 monthly fee), fitness ($99 initiation fee and $49-$99 monthly fees), and tennis memberships ($399 initiation fee and $99-$149 monthly fees).

9.    When Rasnake was hired and until November 2007, Rasnake worked for American Golf.  The entity that operated Arrowhead.

10.   In what was considered a favorable market for private country clubs, Rasnake's sales numbers increased in 2006 and 2007.

11.   Under American Golf, Rasnake earned a base salary and commissions on initiation fees, new dues added, and tournament sales.

12.   Evergreen acquired Arrowhead from American Golf in or about November 2007.

13.   In addition to Arrowhead and other private clubs across the country, Evergreen acquired two additional private clubs in the Phoenix metropolitan area in late 2007. These clubs were Tatum Ranch Golf Club and Ancala Country Club.

14.   Economic conditions changed in 2008, and the market for private country clubs became one of the worst markets the industry had experienced in over thirty years.

### Rasnake's Subordinate

15.   Throughout Rasnake's employment for Evergreen, Rasnake had one subordinate, Barbie Gonzales ("Gonzales").

16.   Like Rasnake, Gonzales' job was also to sell club memberships.  However, her focus was on selling fitness, tennis, and social memberships.  Her office was located in the fitness center whereas Rasnake's office was located at the clubhouse.

17.   Under American Golf and after Evergreen took over operations of Arrowhead throughout 2008 and until March 2009, Rasnake and Gonzales worked as a sales team.  Rasnake earned commissions on sales made by Gonzales and sales made by Gonzales were counted toward Rasnake's monthly and annual sales goals.

18.   Rasnake was the only MD at any club Evergreen operated to earn commissions from a subordinate's sales and to have a subordinate's sales count toward his individual sales

goals.

19. To track sales on the SAGE system, employees had their own login information that they would use to access SAGE and enter their sales numbers.

20. While entering her own sales numbers, Gonzales would routinely enter some sales that Rasnake had made under her own name.

21. The amount of sales attributed to Gonzales that were actually Rasnake's personal sales were minimal and equated to approximately 10% of Gonzales' sales.

### Rasnake's Performance as Membership Director in 2008

22. Rasnake's sales goals in 2008 were inherited from American Golf and Evergreen made no changes to them.

23. In 2008, Rasnake failed to meet his sales goals even with sales that were attributed to Gonzales.

24. Rasnake had one of the lowest sales percentages of any MD working for Evergreen in 2008.

25. Of the 16 MDs on the 2008 Sales Report with sales goals, only two MDs reached or exceeded their goals.  Six of the MDs, including Rasnake, finished 2008 having achieved less than 50% of their goals.

### Swanson's Arrival at Arrowhead

26. In December 2008, Evergreen hired Chase Swanson ("Swanson") to take over as the General Manager ("GM") at Arrowhead, effective in January 2009.

27. Swanson came to Arrowhead on December 18, 2008, to attend a meeting and address the department heads that would be working for him when he took over as the GM. The meeting was informal and was set up as an opportunity for Swanson to meet the department heads.  Approximately twelve people attended the 45 minute long meeting.

28. The MD at Arrowhead is a department head position and Rasnake was at the meeting.

29. Swanson had never met Rasnake prior to the meeting.

30. During the meeting Swanson was asked if he would be coming to Arizona with any

children.  Swanson said he had no children but had a large dog and in an attempt at levity he compared caring for the dog to "raising a retarded kid."

31.   Rasnake has cerebral palsy and is visibly impaired in his right arm.

32.   Rasnake was offended by Swanson's use of the word retarded in a professional environment.

33.   No one said anything to Swanson about his comment at the meeting or immediately following the meeting.

34.   Rasnake did not believe that Swanson was speaking about him or to him when Swanson made the comment.  Rasnake believed that the comment was referring derogatorily to people with disabilities.  Rasnake believed that the use of the word retarded at an initial meeting with new staff created a hostile working environment for him and was a violation of the ADA.  Rasnake felt that he could not work directly for Swanson after the comment.

35.   Approximately three days after the meeting, Rasnake contacted the director of HR at Arrowhead, Charla Reeves ("Reeves") and complained about Swanson's comment. Rasnake told Reeves that he did not feel he could work for Swanson and wanted something to be done about the situation.

36.   Rasnake also complained about the comment to Dale Folmar ("Folmar") the Regional Vice President for Evergreen at the time and Swanson's ultimate supervisor.

37.   Reeves called Swanson before he began at Arrowhead and asked him about the comment and informed him that someone had complained to HR about the comment. Reeves did not tell Swanson who made the complaint.

38.   Swanson began work at Arrowhead in early January 2009.

39.   Folmar and Reeves apologized on behalf of Evergreen to Rasnake individually. Swanson was never told specifically who made the complaint; as a result Swanson apologized for his comment at a department head meeting in January 2009, after he began working at Arrowhead.  Rasnake was not at that meeting.

40.   Through rumor only, Swanson thought that Rasnake had been the person that had

1     complained to HR.

2  41.   Swanson's management style was described by another department head, Ryan Davis

3        ("Davis"), as "my way or the highway."

4  42.   In a conversation at some point in January 2009 with Davis, a friend of Rasnake's and

5        the Food and Beverage Director at Arrowhead, Swanson said that he would "phase

6        out" "people that weren't on his program."

7  43.   After assuming the role of GM, Swanson made various changes in order to attract

8        new members and help sales.  He made changes to the tennis program where he

9        terminated the contracts of the independent contractors that worked there and he made

10       changes to clubhouse maintenance and aesthetics around the club.

11                    **Performance of Evergreen's Private Clubs**

12  44.  Belinda Short ("Short") was the Vice President of Sales and Marketing for Evergreen

13       in 2008 and 2009 and was based in Texas.

14  45.  Richard Ellis ("Ellis") was the Senior Vice President of Private Clubs at Evergreen in

15       January 2009 and was also based in Texas.  In this position Ellis was Swanson's

16       direct supervisor.

17  46.  Short and Ellis regularly reviewed the sales numbers of Evergreen's private clubs on

18       the SAGE system.  When performance issues at clubs became apparent Short and

19       Ellis would consult with the club's particular GM to address the problems.

20  47.  GMs were the parties responsible for issuing employee's PIPs at their respective

21       clubs.  Short did not have the authority to issue a PIP to an employee at a club on her

22       own.

23  48.  Until January 2009, and after recently acquiring a large number of private clubs,

24       Evergreen took no action against MDs at their clubs in order to increase membership

25       sales and had not placed any MDs on PIPs.

26  49.  In late January 2009, Evergreen put their first MD on a PIP, Debbie Teichert at Fox

27       Meadow Country Club.  She was put on a PIP for not meeting her 2008 initiation fee

28       and new dues added revenue targets (she met 47% of her 2008 goal), her inability to

maintain a professional attitude, for not generating sufficient prospect inventory to support the club's sales plan, and for negatively affecting the work efficiency or performance of other employees.  On the PIP, she was expected to meet her first quarter sales goals and make 50 outbound sales calls per week and track them in SAGE.  She was informed that if she failed to meet her expectations she could be terminated.

50. In mid-February 2009, Evergreen put another MD on a PIP, Lisa Hungate at Ancala Country Club, in Phoenix, Arizona.  She was also put on a PIP for not obtaining her 2008 initiation fee and new dues added revenue targets (she met 65% of her 2008 goal) and for not generating sufficient prospect inventory to support the club's sales plan.  On her PIP, she was expected to meet her sales goals over the next 60 days ($61,995 in March and $56,995 in April), to make 50 outbound sales calls per week and track them in SAGE, and she was expected to form a Membership Committee by April 15, 2009.  She was also informed that if she failed to meet these expectations she could be terminated.

51. Evergreen terminated both Teichert and Hungate's employment at the conclusions of their plans because both of them failed to meet the expectations in their PIPs.

**Rasnake's Performance as Membership Director Under Swanson**

52. Like the sales goals for 2008, the sales goals in 2009 were also inherited from American Golf and Evergreen made no changes to them.

53. By the end of January 2009, the sales team of Rasnake and Gonzales together made just over $7,100 compared to a goal that month of $20,472.

54. Rasnake only logged $366 in sales in January 2009 and was the lowest producing MD at any private club Evergreen operated that month.

55. Rasnake's office was located next to Swanson's office and they spoke frequently.

56. At no time did Rasnake present Swanson with a plan to increase membership in order to bring revenue into the club.

57. In January 2009, Swanson became aware that Gonzales was erroneously logging a

minimal amount of sales numbers for Rasnake under her own sales numbers in SAGE.

58.  Rasnake spent approximately 35-40% of his time focused on tournament sales.

59.  Tournaments were only held on Mondays at Arrowhead and the club held approximately 15 tournaments per year while Rasnake was there.

60.  Tournaments did expose people to the club and provide a possible contact for new membership.  However, approximately half of the tournaments each year were from repeat tournament customers who had already been exposed to the club and could not be considered new prospects for membership.

61.  Revenue from tournament sales was minimal when compared to revenue generated from golf membership sales.  The revenue raised from initiation fees on golf memberships alone was over two times higher than the revenue raised from tournament sales.

**Rasnake's Performance Improvement Plan**

62.  By at least February 2009, Short, Ellis, and Swanson began considering putting Rasnake on a PIP.

63.  Swanson was not the sole party making the determination of whether or not to place Rasnake on a PIP.

64.  By the end of February 2009, Rasnake did not meet his monthly or yearly sales goal in February 2009.  Rasnake sold $8,979 in February compared to a goal of $36,602, 24.53% of his goal.  Gonzales sold $9,352 in February.

65.  The two MDs that Evergreen had put on PIPs prior to Rasnake had come closer to meeting their 2008 sales goals than Rasnake.

66.  After his sales performance in 2008 and his low sales numbers in January and February 2009, Rasnake was issued a PIP on March 3, 2009.  Rasnake's PIP was almost identical to Hungate's PIP.  Rasnake's PIP was issued for not obtaining his 2008 initiation fee and new dues added revenue targets, for not generating sufficient prospect inventory to support the club's sales plan, and for not properly tracking and

maintaining client relationships in order to maintain an effective sales process.  As part of the PIP, Rasnake was expected to meet the initiation and new dues added target at Arrowhead over the next 60 days ($16,617 in March and $20,539 in April) on his own; he was expected to make 50 outbound sales call per week and track all calls and communications activity in SAGE; and he was expected to form a Membership Committee of eight to ten members within the next 60 days but no later than April 15, 2009.

67.     These expectations required no more of Rasnake than his job description already mandated.

68.     Rasnake did not consider these expectations unattainable and he knew he would be evaluated while on the PIP.  While the sales goal expectation was partly outside of Rasnake's control to meet, the expectation to make 50 outbound sales calls per week and the expectation to form a Membership Committee by April 15th were entirely within Rasnake's control to achieve.

69.     Under Rasnake's expectation in the PIP to make 50 outbound sales calls per week, "calls" and "communications" are separate terms and do not mean the same thing.  Rasnake knew how to use SAGE and understood how to track his sales calls and communications.

70.     Rasnake was informed and understood that if he failed to make significant and meaningful progress toward meeting the expectations on the PIP he could be terminated.

## Compensation Change

71.     In April 2009, Evergreen changed Rasnake's compensation structure.

72.     The decision to change compensation structure was made by Short and Ellis and was done to address performance issues within Membership Departments at Evergreen's private clubs.

73.     The compensation for MDs working for Evergreen varied after Evergreen acquired numerous private clubs throughout the United States prior to April 2009.  Prior to

April 2009, Evergreen had made no changes to their MDs compensation structures.

74. In April 2009 compensation was changed for MDs throughout Evergreen to make compensation consistent throughout the company and primarily to focus MDs on membership sales in order to raise revenue from membership dues.

75. Rasnake's annual base salary was not changed and remained at $33,000 per year. Rasnake's commission on Initiation Fees was lowered from 40% to 5%.   His commission on New Dues Added was raised from 40% to 85%.   His commission on Tournament Sales was lowered from 20% to 0%, and he was given $25 for each Annual Elite Program he sold.

76. Commission on tournament sales was not removed from all MD's compensation. Ellen Haboush, the MD at Tatum Ranch in Phoenix was still given commission on tournament sales.

77. Prior to 2009, Rasnake was not given an annual bonus.   With the compensation change, Rasnake would be given an annual $1,500 bonus.

78. Prior to issuing the compensation change to Rasnake, Evergreen considered giving Rasnake an annual $3,300 bonus.   This number was changed to $1,500 by Short and Ellis and made consistent among MDs at Evergreen.

79. Under his former compensation structure, Rasnake made approximately $59,800 as the MD at Arrowhead in 2008.

80. Plaintiff argues that Evergreen discriminated against Rasnake by changing his compensation structure.   Yet, partly under the new compensation structure, Rasnake made $25,707.75 in the first four months of 2009.   Thus, Rasnake was on track to make $77,123.25 in 2009 without his annual bonus—a 29% increase in compensation from the year prior.

**Rasnake's Performance on the PIP and Termination**

81. By the end of April 2009, Rasnake had not met the expectations of his PIP and in Swanson's opinion had not made significant progress toward meeting the expectations.

82.   The decision to terminate Rasnake was made by Ellis, Short, and Swanson.

83.   On May 1, 2009, Swanson met with Rasnake and informed Rasnake that he was being terminated for not meeting the expectations of his PIP.

84.   Under the PIP, Rasnake was expected to sell $37,156.00 in initiation fees and new dues added in March and April.  By the end of April 2009, Rasnake failed to meet this sales expectation by $14,701; he achieved only 58.7% of his goal.

85.   Under the PIP, Rasnake was expected to make 50 outbound sales calls per week in March and April.  By the end of April 2009, Rasnake had failed to make 50 outbound phone calls in any week while on the PIP.  Rasnake claims he believed "outbound sales calls" meant any form of communications with potential customers.  Yet, Rasnake even failed to meet his own interpretation of the PIP.  Rasnake failed to make 50 new "communications" in four of the ten weeks on the PIP and averaged less than 50 new "communications" per week while on the PIP.

86.   Under the PIP, Rasnake was expected to form a Membership Committee of eight to ten members by April 15, 2009.  By the end of April 2009 there was no evidence that Rasnake met this expectation.  Rasnake scheduled a meeting for a Membership Committee on April 22, 2009.  Even though the expectation called for a Membership Committee of eight to ten members, less than eight members were set to attend the meeting.  Rasnake eventually cancelled the meeting because only one member was going to be able to attend.  The member that was going to attend did not get word that the meeting was cancelled and showed up at the club on the evening of April 22nd expecting a meeting.  Rasnake had gone home for the day and needed to be called by the Catering Manager to inform the member about the status of the meeting.

87.   While on the PIP, Rasnake made no effort to communicate his progress in forming a Membership Committee to Swanson.  Rasnake did not offer any notes, emails, records, or proof to Swanson that a Membership Committee was being formed or had been formed.  Rasnake did not track who he considered was a part of the Membership Committee he alleges he formed.  When terminated for not meeting the expectations

in his PIP, and specifically for not forming a Membership Committee, Rasnake offered no proof of any progress toward meeting this expectation.

**Severance and Designation as Ineligible for Rehire**

88.   Rasnake was not awarded severance pay.

89.   Rasnake was designated ineligible for rehire by Swanson.

90.   Swanson designated Rasnake ineligible for rehire because of Rasnake's documented performance issues.

91.   Rasnake's documentation included his PIP issued in March 2009, and when Rasnake was terminated in May 2009, documentation shows he was counseled by Swanson and informed that he was being terminated because he did not meet the performance expectations of his PIP.

92.   HR at Evergreen recommends awarding severance pay to a terminated employee when there is no documentation of performance issues.  If there is documentation of performance issues than severance is not recommended by HR.

93.   Neither Teichert nor Hungate were awarded severance after being terminated for failing to meet the expectations of their documented PIPs.

94.   To be awarded severance a terminated employee must also sign a waiver releasing Evergreen from any claims the terminated employee may have against Evergreen.

95.   Rasnake did not sign the waiver releasing Evergreen from claims.

96.   When Swanson was terminated in December 2009, Swanson signed the waiver releasing Evergreen from claims.

97.   There is no documentation of performance issues in Swanson's file.

98.   Swanson was awarded severance pay when terminated by Evergreen.

II.   **CONCLUSIONS OF LAW**

1.   Plaintiff's Second Amended Complaint alleges disability discrimination and retaliation claims under the ADA.

2.   The Court summarily dismissed Plaintiff's disability discrimination claim on March 26, 2013 (Doc. 65).

3.      Plaintiff's remaining retaliation claim is made under Title I and § 503(a) of Title V of the ADA, 42 U.S.C. § 12203(a).

4.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. The action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. § 706(f)(1), (3) and 707 of Title VII of the Civil Rights Act of 1965 ("Title VII"), 42 U.S.C. § 2000e-5(f)(1), (3) and 2000e-6, and is pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

5.      Retaliation claims under the ADA are adjudicated under the same framework as Title VII retaliation claims. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) *vacated on other grounds sub nom, U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

6.      To establish a retaliation claim under the ADA, a plaintiff must show (1) that he or she engaged in or was engaging in activity protected by the ADA, (2) the employer subjected him or her to an adverse employment decision, and (3) that there was a causal link between the protected activity and the employer's action. *Id.*; *see also* 9TH CIR. CIV. JURY INSTR. 12.10 (2007).

7.      Until recently in the Ninth Circuit, the plaintiff in an ADA retaliation claim could establish the causal element of a retaliation claim by merely showing that the protected activity was a motivating factor in the adverse employment action. However, following the recent United States Supreme Court decision in *University of Texas Southwestern Medical Center v. Nassar*, the causal link between the protected activity and the employer's action in a retaliation claim under Title VII must be "proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 133 S.Ct. 2517, 2533 (2013). Accordingly, in Plaintiff's ADA claim, Plaintiff must show that Rasnake's complaint to HR about Swanson's comment was

1    the but-for cause of Evergreen's employment decisions.  Specifically, Plaintiff must

2    prove by a preponderance of the evidence that but for Rasnake's complaint to HR,

3    Evergreen would not have changed Rasnake's compensation structure, placed him on

4    a PIP, terminated him, designated him ineligible for rehire, and decided not to give

5    him severance.

6                                        **Protected Activity**

7    8.    In order for Rasnake's complaint to HR to constitute protected activity, Rasnake must

8          have had a reasonable belief that the conduct he was complaining about, i.e.

9          Swanson's single use of the word retarded in Rasnake's presence violated the ADA.

10         *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).

11   9.    "The reasonableness of [a plaintiff's] belief that an unlawful employment practice

12         occurred must be assessed according to an objective standard—one that makes due

13         allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs

14         about the factual and legal bases of their claims."  *Moyo*, 40 F.3d at 985.  Even if a

15         plaintiff's belief is mistaken, it is reasonable "if premised on a mistake made in good

16         faith.  A good-faith mistake may be one of fact or of law."  *Id*. at 984 (citing *Jurado v.*

17         *Eleven-Fifty Corp*., 813 F.2d 1406, 1411 (9th Cir. 1987) (English-only order not a

18         Title VII violation as a matter of law, but opposition based on a reasonable belief that

19         the order was discriminatory is protected)).  Further, "it has been long established that

20         Title VII, as remedial legislation, is construed broadly.  This directive applies to the

21         reasonableness of a plaintiff's belief that a violation occurred, as well as to other

22         matters."  *Id*. at 985 (citation omitted).  However, "'offhand comments, and isolated

23         incidents (unless extremely serious)' do not amount to discrimination.  If a person has

24         been subjected to only an isolated incident, a complaint about that incident does not

25         constitute protected activity unless a reasonable person would believe that the isolated

26         incident violated Title VII.  This reasonable person determination requires '[l]ooking

27         at all the circumstances, including the frequency of the discriminatory conduct[ ][and]

28         its severity.'"  *E.E.O.C. v. Go Daddy Software, Inc*., 581 F.3d 951, 963 (9th Cir.

2009) (quoting *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

10. In the order granting summary judgment to Defendant on Plaintiff's discrimination claim, the Court found based on the facts developed through discovery that Rasnake had an objectively reasonable belief that Swanson's comment constituted a violation of the ADA. (Doc. 65 at 19).

11. When considering the facts of this case at the summary judgment stage, this Court was required to construe all disputed facts in the light most favorable to the Plaintiff. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). However, the Court is no longer under such a mandate when acting as the finder of fact at a bench trial.

12. Rasnake alleges he believed Swanson's comment created a hostile work environment and therefore it violated the ADA. However, the Ninth Circuit Court of Appeals has not recognized a hostile work environment claim under the ADA and has declined to decide whether such a claim even exists. *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003); *see also Meirhofer v. Smith's Food & Drug Centers Inc.*, 415 F. App'x 806, 807 (9th Cir. 2011). If such a claim does exist, "[a] hostile work environment claim under the ADA would be governed by the same legal standards as hostile work environment claim under Title VII." *Rood v. Umatilla Cnty.*, 526 F. Supp. 2d 1164, 1176 (D. Or. 2007). To make out a hostile work environment claim under Title VII a plaintiff must show that the conduct was sufficiently severe or pervasive to alter the condition of the plaintiff's employment and create an abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A totality of the circumstances test is used to determine whether a plaintiff's allegations make out a colorable hostile work environment claim. *Id.* at 23. "[M]ere utterance of an epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Such circumstances may include the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 21-22 (quotations and citations omitted). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Rather, the offensive conduct "must be extreme to amount to a change in the terms and conditions of employment." *Id.*

13. Given this standard, the Court concludes that Rasnake did not have a reasonable belief that Swanson's single use of the word retarded at a staff meeting, that was not directed at Rasnake, and that did not even reference Rasnake's particular disability, created a hostile work environment for Rasnake and violated that ADA. Swanson's offhand comment was an isolated incident and was not severe or pervasive enough for a reasonable person to believe that a hostile work environment was created. Consequently, the Court finds that Rasnake's complaint to HR was not protected activity.

14. Even assuming, *arguendo*, that Rasnake had a reasonable belief, Plaintiff still fails to prove the remaining elements of a retaliation claim.

### Adverse Employment Actions

15. An adverse employment action is any action that "is reasonably likely to deter employees from engaging in protected activity" if the action were based on a retaliatory motive. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). Whether the action was actually based on a retaliatory motive is determined in the causation prong of the test for retaliation. *Id.* at 1243 n. 6. Thus, merely finding that an employer's decision is an adverse employment action does not automatically designate the employer's decision retaliatory. "Adverse employment decisions include 'actions that materially affect[ ] compensation, terms, conditions, or privileges' of employment." *James v. C-Tran*, 130 F. App'x 156, 157 (9th Cir. 2005)

(quoting *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002)). The Ninth Circuit defines the term adverse employment action "broadly," and examples of adverse employment actions could include "transfers of job duties," "transfer to another job [even] of the same pay and status," "changes in work schedules," *Ray*, 217 F.3d at 1240–43 (internal citation omitted), "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion," *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (internal citations omitted). However, merely placing someone on a performance improvement plan is not a per se adverse employment action. For example, a performance improvement plan that was non-disciplinary training that did not materially impact a plaintiff's compensation, terms, conditions, or privileges of employment was not considered an adverse employment action. *James*, 130 F. App'x at 157.

16. The Court concludes that changing Rasnake's compensation structure was an adverse employment action. Evergreen transferred Rasnake's job duty of tournament sales to another department head, changed his commission structure, and changed his bonus amount prior to showing him he would be getting a bonus.

17. The Court concludes that placing Rasnake on a PIP was an adverse employment action. Placing Rasnake on a PIP under the circumstances in this case, if it were done with a retaliatory motive, would reasonably likely deter someone in similar circumstances from engaging in protected activity in the future.

18. The Court concludes that Rasnake's eventual termination was inherently an adverse employment action.

19. The Court concludes that designating Rasnake ineligible for rehire was inherently an adverse employment action.

20. The Court also concludes that not giving Rasnake severance pay was an adverse employment action.

//

**But-For Causation**

21. Retaliation claims require proof by a preponderance of the evidence that the adverse employment action would not have occurred in the absence of the protected activity. *See Nassar*, 133 S.Ct. at 2533.

22. The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to change Rasnake's compensation structure by no longer paying Rasnake commissions on Gonzales' sales and counting Gonzales' sales toward Rasnake's sales goals. Prior to this change, Rasnake was the only MD at Evergreen receiving commissions and credit for a subordinate's sales. Evergreen had recently acquired a large percentage of its private clubs where compensation for MDs varied. Until 2009, Evergreen had not changed compensation structures across the clubs to make them consistent. Evergreen made this change in order to make sales goals and commissions consistent among all MDs at the company. Evergreen wanted to create more incentive for MDs to focus on golf membership sales. Gonzales' focus was not on golf membership sales and paying Rasnake commissions on Gonzales' sales did not help Evergreen add golf memberships by incentivizing Rasnake to sell them. Accordingly, Evergreen had a legitimate reason for deciding not to pay Rasnake commissions on Gonzales' sales and not to count her sales toward Rasnake's membership sales goals.

23. The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to change Rasnake's compensation structure by no longer paying Rasnake commissions on tournament sales. Golf membership dues were by far the most important revenue producing product that Evergreen sold. Tournament sales were also a revenue generating product, but the revenue generated by tournament sales was minimal. The revenue from initiation fees for golf memberships alone was over two times higher than revenue raised by tournament sales. Arrowhead only hosted tournaments on Mondays throughout the year because those were the only days the private club could close. Arrowhead only hosted

approximately 15 tournaments per year. Tournaments did have the potential to increase prospects for membership. However, approximately half of the 15 tournaments each year were from repeat customers who were already exposed to the club and could not be considered new contacts. Yet, in spite of decreasing sales numbers Rasnake spent 35-40% of his time focused on tournament sales. Further, Evergreen sought to focus all MDs efforts on membership sales as that was the primary focus of their job descriptions and the most important factor to each club. Evergreen only paid commissions on tournament sales to MDs on a case by case basis that it was their right to determine as long as the reasons to do so were not retaliatory. Thus, Evergreen had legitimate reasons for deciding not to pay Rasnake commissions on tournament sales.

24.  The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to change Rasnake's compensation structure by changing his 2009 bonus from $3,300 to $1,500 prior to ever showing Rasnake his 2009 compensation. The change to the bonus was made by Ellis and Short and it was consistent with bonuses offered to other MDs. Accordingly, Evergreen had a legitimate reason for changing the bonus before offering the bonus to Rasnake.

25.  The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to place Rasnake on a PIP. Evergreen had legitimate non-retaliatory reasons for putting Rasnake on the PIP. Rasnake had one of the lowest individual membership sales percentages for MDs in 2008. Rasnake's sales numbers in January and February 2009 were still some of the lowest in the company. Rasnake had provided no plan to his supervisors for how he was going to increase membership sales. Rasnake was not singled out to be put on a PIP as two other MDs at Evergreen were also put on PIPs within the first three months of 2009, including another MD in Phoenix, Lisa Hungate. The two MDs also put on PIPs had better sales numbers in 2008 than Rasnake. Swanson was not the sole party making the determination of whether or not to place Rasnake on a PIP. Rasnake's PIP was issued for two of the

three same reasons that Hungate's PIP was issued and contained identical expectations to Hungate's PIP with regard to their respective clubs.  Evergreen did not give Rasnake comparatively higher and unreasonable sales expectations in his PIP, as Hungate's expected sales on her PIP were higher than Rasnake's and Rasnake did not feel his expectations were unattainable.   The three performance expectations in Rasnake's PIP did not require anything more than Rasnake's job description already required of him.

26.     The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to terminate Rasnake's employment.  Evergreen had legitimate non-retaliatory reasons for terminating Rasnake's employment.  Rasnake did not meet the expectations of his PIP.   The PIP clearly explained to Rasnake that the consequences of not making significant and meaningful progress toward meeting the performance expectations included possible termination.   Rasnake understood the expectations in the PIP and the consequences of not making progress toward those expectations when he signed the PIP.  Rasnake did not think the sales expectations in the PIP were unattainable, nothing prevented him from making 50 sales calls per week or forming a membership committee per the expectations in the PIP, nor was the time frame of the PIP unreasonable.  Rasnake failed to meet the sales goals outlined in the PIP by $14,701.  Rasnake failed to make 50 outbound phone calls in any week while on the PIP even though he knew how to track his sales calls and knew he was being evaluated.   Even if the Court were to consider new contacts made under Rasnake's alleged understanding of the "outbound sales calls" expectation, Rasnake failed to make 50 new contacts in four of the ten weeks on the PIP and averaged less than 50 new contacts in every week while on the PIP.  In spite of being expected to form a membership committee by April 15, 2009, Rasnake made no effort to communicate his progress with his supervisor while on the PIP nor did Rasnake track who he considered was a part of the Membership Committee he alleges he formed. When terminated, in part for not forming a Membership Committee, Rasnake offered

no proof of any progress toward meeting this expectation.  Like Rasnake, the other two MDs placed on PIPs were also terminated for not meeting the expectations in their plans.

27.  The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to designate Rasnake ineligible for rehire.  Evergreen had a legitimate non-retaliatory reason for designating Rasnake ineligible for rehire.  Rasnake was designated ineligible for rehire by Swanson because of his documented performance issues.  Rasnake had a documented PIP issued to him in March 2009 and he had documentation showing his failure to meet the expectations of his PIP in May 2009.

28.  The Court concludes that Rasnake's complaint to HR was not the but-for cause of Evergreen's decision to give Rasnake severance.  Severance is recommended if the terminated employee does not have any documented performance issues.  Rasnake had documented performance issues.  Further, a terminated employee must sign a waiver releasing Evergreen from all claims to be awarded severance.  Rasnake did not sign the waiver.  Thus, Evergreen had legitimate non-retaliatory reasons for not awarding Rasnake severance pay.

**III.  VERDICT**

Based on the foregoing findings of fact and conclusions of law,

**IT IS ORDERED** finding for Defendant against Plaintiff.  Plaintiff shall take nothing.  The Clerk of the Court shall enter judgment accordingly.

Dated this 20th day of August, 2013.

James A. Teilborg
Senior United States District Judge